1

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 **ART ATTACKS INK, LLC,**                    )     **Civil No: 04 CV 1035-B(BLM)**
                                               )
13              **Plaintiff,**                 )
   **v.**                                      )     **ORDER ON DEFENDANTS'**
14                                             )     **MOTIONS FOR JUDGMENT AS A**
   **MGA ENTERTAINMENT, INC., et al.**         )     **MATTER OF LAW**
15                                             )
                **Defendants.**                )
16                                             )
   _____    )
17                                             )
                                               )
18                                             )

19

20

21       Defendants MGA Entertainment, Inc. and Issac Larian renew their motions for

22 judgment as a matter of law under Fed. R. Civ. P. 50(b) on the following issues: (1) trade

23 dress infringement; (2) copyright infringement; and (3) contributory copyright infringement

24 as to Issac Larian.

25 **I.      BACKGROUND**

26       In May 2004, Art Attacks Ink LLC ("Art Attacks") filed a complaint against

27 Defendants MGA Entertainment, Inc. ("MGA") and Issac Larian ("Larian") alleging

28                                        1                              04cv1035

1  multiple causes of action including trademark, trade dress and copyright infringement.

2  (Complaint; Docket No. 1.)   Art Attacks alleged that MGA's use of the trademark BRATZ

3  and the dolls and other associated products identified as BRATZ infringed Art Attacks'

4  copyrighted airbrush artwork, Art Attacks' trade dress associated with its airbrushed

5  cartoon characters and Art Attacks' marks BRAT, BRATS and SPOILED BRATS.

6      Art Attacks initially moved for a preliminary injunction; this was denied in

7  September 2004.  (Order September 7, 2004; Docket No. 64.)  In October 2006, the Court

8  heard Defendants' motions for summary judgment on Art Attacks' copyright, trademark

9  and trade dress infringement claims and on Art Attacks' defamation claims.  The Court

10  granted-in-part summary judgment as to no infringement of the marks BRAT and BRATS,

11  finding that finds that Art Attacks had no protection for these two marks.  The Court denied

12  summary judgment as to the mark SPOILED BRAT and also denied the motions with

13  respect to trade dress infringement, copyright infringement and defamation because

14  material issues of fact remained on each of these claims.  (Order Oct. 31, 2006; docket no.

15  295.)  The case then proceeded to trial.[1]

16      A jury trial was held beginning on April 23, 2007, on the remaining copyright,

17  trademark and trade dress infringement claims, including direct infringement claims against

18  MGA and contributory copyright infringement against Larian. The case was submitted to

19  the jury on May 7, 2007.  The jury reached a partial verdict, finding no infringement of the

20  mark SPOILED BRATS; the jury was unable to reach a verdict on the trade dress and

21  copyright infringement claims. Defendants now move for judgment as a matter of law

22  contending that there was insufficient evidence for a reasonable jury to find for Plaintiff on

23  either the trade dress or copyright infringement claims.

24  **II.      LEGAL STANDARD FOR JUDGMENT AS A MATTER OF LAW**

25      "A jury's inability to reach a verdict does not necessarily preclude a judgment as a

26

27          [1] The defamation claim was withdrawn prior to trial.

28                                      2                            04cv1035

1  matter of law."  Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1197

2  (9th Cir. 2000); Fed. R. Civ. P. 50(b).  However, in considering the motion, the Court may

3  not substitute its view of the evidence for the jury's, may not make credibility

4  determinations, and may not weigh the evidence.  Johnson v. Paradise Valley Unified

5  School District, 251 F.3d 1222, 1227 (9th Cir. 2001).  "The test is whether the evidence,

6  construed in the light most favorable to the nonmoving party, permits only one reasonable

7  conclusion . . . ."  White v. Ford Motor Co., 312 F.3d 998, 1010 (9th Cir. 2002). "If

8  reasonable minds could differ as to the import of the evidence, however, a verdict should

9  not be directed."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).

10  **IV.    ANALYSIS**

11        **A.    Copyright Infringement**

12        To prevail on a claim of copyright infringement a plaintiff must show that 1) it owns

13  a valid copyright in the work in question and 2) that the defendant copied protected

14  elements of that work.  Cavalier v. Random House, 297 F.3d 815, 822 (9th Cir. 2002).  A

15  plaintiff may establish copying by either presenting direct evidence of copying or by

16  showing that the defendant had access to the work and that the works at issue are

17  substantially similar.  Id.   Here, MGA moves for judgment as a matter of law only on the

18  element of access, contending that there was insufficient evidence presented at trial on this

19  element.

20        Direct evidence is not always necessary to show access.  Access may be established

21  by showing that the defendant has a reasonable possibility to view the plaintiff's work.

22  Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000).  The evidence must

23  rise beyond mere speculation or a bare possibility, but it may be proved circumstantially

24  such as by showing a chain of events linking plaintiff's work and defendant's alleged

25  access and/or showing that plaintiff's work was widely disseminated.  Id.

26        At trial, Art Attacks presented no direct evidence of access by MGA or Carter

27  Bryant ("Bryant"), the alleged creator of MGAs BRATZ doll designs.  Instead, Art Attacks

28                                              3                              04cv1035

1  offered several lines of circumstantial evidence regarding the possibility of access by MGA

2  and its associates.  The evidence showed that Art Attacks exhibited images of the spoiled

3  brats characters on T-shirts in its booths at numerous fairs in Southern California (such as

4  the Del Mar Fair and the Los Angeles County Fair) starting approximately in 1996.  Art

5  Attacks also had a website that began approximately in the same time frame.

6          Although the evidence showed that millions of people attended the fairs at which

7  Art Attacks exhibited the spoiled brat images, the key question is not whether *anyone*

8  would have had the possibility to view the works, but rather, whether there was a

9  reasonable possibility that the Defendants would have viewed the works.  As to this

10 question, only two pieces of evidence related to the fair exhibitions were presented.  The

11 first was the geographic proximity of MGA and Carter Bryant's work and residence (for a

12 limited amount of time) near and around Los Angeles to the fairs in Southern California at

13 which Art Attacks exhibited its work.  This alone is insufficient.  See Jason v. Fonda, 526

14 F. Supp. 774, 776 (D.C. Cal. 1981) (opinion affirmed and incorporated by Jason v. Fonda,

15 698 F.2d 966, 967 (9th Cir. 1982) (presence of 200-700 copies of plaintiff's book in

16 Southern California bookstores in proximity to defendants working at United Artists and

17 NBC created only a bare possibility, not a reasonable possibility of access).

18         The second piece of evidence was MGA's answer to one of Art Attacks'

19 interrogatories, which indicated that one MGA employee, Aileen Storer, identified as a

20 "relevant, current employee who had decision-making authority with respect to the creative

21 design and development of the first generation 'Bratz' dolls and MGA's first 'Bratz'

22 mark," visited the Los Angeles County fair in Pomona "on one or more occasions."  (Pl.'s

23 Ex. 3050.)   The date was not definitively established; the interrogatory answer, given in

24 2005, stated that she attended sometime in the last ten years, which would place the time

25 between 1995 and 2005.  Art Attacks began exhibiting at this particular fair in 1998. ( Trial

26 Tr. Apr. 24, 2007, Test. J. Mauck 72:13-17.)  The Bratz dolls were first marketed in 2001.

27 Thus, the only relevant years here are 1998-2001, a span of three of the possible ten years

28                                           4

1  Ms. Storer may have attended the fair.  Even with this possibility, it still must be

2  conjectured that Ms. Storer viewed or had the reasonable possibility to view the Art

3  Attacks' booth and saw within that booth the images of the spoiled brats.  The evidence

4  indicated that these images were not featured or highlighted in any way in the booth, but

5  instead were exhibited mixed among a plethora of other images (Trial Tr. Apr. 30, 2007,

6  Test. J. Mauck 240-247; Ex. 5012, 5014, 5060.)

7         The connection of Ms. Storer to Art Attacks' works does not rise above a bare

8  possibility of access.  Although Plaintiff compares the instant circumstances to Three Boys

9  Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000), key differences are apparent.  Three

10  Boys was predicated on wide dissemination plus subconscious copying.  Id. at 482. Not

11  only were plaintiff's songs in that case widely played on radio and television where

12  defendant grew up, but defendant also admitted to being a fan and collector of plaintiff's

13  music.  Here, the connection between Defendants and the works in question is even more

14  attenuated.  Unlike the repeated exposure of the defendant in Three Boys to plaintiff's

15  music, here there is only the possibility that one MGA employee was at the same fair as Art

16  Attacks in the relevant period.  Moreover, the potential exposure of Ms. Storer to the

17  spoiled brat images, surrounded in Art Attacks' booth by many others images, was

18  minimal.

19         As to the dissemination of the work on Art Attacks' website, the evidence was

20  insufficient to establish either wide dissemination or an inference that MGA or Bryant had

21  a reasonable possibility of visiting the site.  There was no evidence of "hits" to the website,

22  nor evidence that MGA or its associates ever viewed the website.  There were no

23  searchable "metatags" related to the spoiled brats that would likely lead a user to the site.

24  No evidence was presented that MGA or Bryant ever used the web in general in connection

25  with the design of their BRATZ products.  In its totality, there was no evidence to suggest

26  MGA and/or its associates had a reasonable possibility of viewing or even stumbling across

27  Art Attacks' website.  See e.g., Hoch v. MasterCard Intern. Inc., 284 F. Supp. 2d 1217,

28                                              5                              04cv1035

1   1221 (D. Minn. 2003) (failure to track "hits" to website in relevant months coupled with no

2   evidence that anyone actually viewed the site was insufficient to establish wide

3   dissemination based on website); <u>Nicholls v. Tufenkian Import/Export Ventures, Inc.</u>, 367

4   F. Supp.2d 514, 521 -522 (S.D.N.Y. 2005) (insufficient evidence of access where plaintiff

5   could not establish when the images were posted to the website, nor that defendant viewed

6   the site before the accused work was created).

7          Finally, Art Attacks' argument that the question of access relies on the jury's

8   determination of Bryant's credibility is not persuasive.  Art Attacks argues that the jury was

9   not required to believe Bryant's testimony regarding when and how he conceived of the

10  BRATZ doll designs and that Bryant's credibility was challenged when it was revealed that

11  Bryant's contract with Mattel, overlapping the relevant time period, may have provided a

12  motive for him to "create" this story. (Trial Tr. May 2, 2007, Test. Bryant  101:24-102-1,

13  110:24-114:5, 117:2-12, 120:20-121:14, 121:15-19; Ex. 3071, 3073.)  Even if *arguendo* the

14  jury discarded all of Bryant's testimony on the BRATZ creation, the absence of this

15  evidence does not "create" evidence in Art Attacks' favor to substantiate a reasonable

16  possibility of access by Bryant or MGA to Art Attacks' works; it only creates an absence of

17  explanation as to how Bryant and/or MGA created the BRATZ.

18         In sum, Plaintiff's evidence requires too much conjecture and speculation to

19  generate a reasonable possibility of access.  Because the Court therefore finds that there

20  was no evidence on which a reasonable jury could find the required element of access,

21  MGA's motion for judgment as a matter of law on the claim of copyright infringement is

22  **GRANTED**.

23         **B.      Contributory Infringement**

24         Based on the determination as a matter of law that there is no copyright infringement

25  by MGA, there can be no contributory infringement by Larian.  Thus, simply on this

26  ground, the motion is **GRANTED**.

27         Moreover, even without the finding on copyright infringement, as a matter of law,

28                                            6                                    04cv1035

1   the Court finds that no reasonable jury could find contributory infringement by Larian

2   based on the evidence presented at trial.  The Court instructed the jury that contributory

3   infringement could be proven by a showing that Larian knew or should have known of

4   MGA's infringing activity along with a showing that he induced, caused or materially

5   contributed to the infringing activity.  (Court's Jury Instruction No. 41; Docket No. 441.)

6          There was no evidence of actual knowledge by Larian that MGA's works infringed

7   Art Attack's copyright.  The only evidence argued by Art Attacks' to evidence Larian's

8   knowledge is its supposition that Larian should have known of the infringement.  Art

9   Attacks speculates that Bryant's testimony regarding his association with Mattel during his

10  negotiations with MGA creates credibility issues as to how and when Bryant may have

11  conceived of the BRATZ doll design.  Art Attacks thus argues that Larian should have been

12  tasked with doing a fuller investigation before using Bryant's designs.  However, even

13  given this supposition, Art Attacks failed to establish that Larian should have known of Art

14  Attacks' copyright or that Bryant's designs may have infringed such rights.  Furthermore,

15  negligence is not the standard here; contributory infringement involves a showing of

16  knowledge and intent.[2]  The Court therefore finds that no reasonable jury could have found

17  Larian liable for contributory infringement and on this ground as well, MGA's motion for

18  judgment as a matter of law is **GRANTED**.

19          **C.      Trade Dress Infringement**

20          "[T]rade dress may be protected if it is nonfunctional and has acquired secondary

21  meaning and if its imitation creates a likelihood of consumer confusion."  Fuddruckers, Inc.

22

23          [2] The Ninth Circuit has recently (a few weeks after the instant trial ended) refined its standard for
24  contributory infringement based on the U.S. Supreme Court's opinion in Metro-Goldwyn-Mayer Studios Inc.
    v. Grokster, Ltd., 545 U.S. 913, 932 (2005).  "[A]n actor may be contributorily liable for intentionally
25  encouraging direct infringement if the actor *knowingly* takes steps that are substantially certain to result in such
    direct infringement."  Perfect 10, Inc. v. Amazon.com, Inc., - - F.3d - - , 2007 WL 1428632, *17 (9th Cir. May
26  16, 2007) (emphasis added).  To the extent that Perfect 10 removes the "should have known" aspect of
    contributory infringement provided in the Court's jury instructions, it is unclear that this new standard would
27  apply retroactively to the instant case.  Regardless, since the Court finds that the evidence fails to support even
    the lower "should have known" standard, Perfect 10 would not change the Court's ruling here.

28                                                          7                                    04cv1035

1  v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987).  MGA argues that there was

2  insubstantial evidence for a jury to find secondary meaning or likelihood of confusion

3  based on the evidence presented at trial.

4              **1.      Secondary Meaning**

5       "A product's trade dress attains secondary meaning when the purchasing public

6  associates the dress with a single producer or source rather than just the product itself."

7  First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1987).  A number of

8  factors can be indicative of secondary meaning and these were provided to the jury in

9  Court's Jury Instruction No. 53: (1) purchaser perception; (2) advertisement; (3)

10  demonstrated utility; (4) extent of use; (5) exclusivity; and (6) actual confusion.  The first

11  two factors constitute the focus here.

12       Very little evidence of purchaser perception was presented to the jury.  Art Attacks

13  had no survey evidence of purchasers which could have provided persuasive evidence of

14  consumer's recognition of the trade dress.  See Vision Sports, Inc. v. Melville Corp., 888

15  F.2d 609, 615 (9th Cir. 1989) ("An expert survey of purchasers can provide the most

16  persuasive evidence of secondary meaning.").[3]  While Art Attacks points to the testimony

17  on the distinctive style of its images, only one purchaser testified on this issue; the

18  remainder of the testimony came from Art Attacks' expert Dru Blair, an artist, Sheila Boyd,

19  a fair vendor, and Wendy Hodent, a friend to Joanne Mauck and co-exhibitor at the Del

20  Mar Fair.  None of these witnesses constitute the purchasing public.  Only one purchaser,

21  Tammie Gallagher, testified to the association she made between the image on Art Attacks'

22  business card and the Art Attacks company.[4]

23  _____

24       [3] Absence of a survey evidence or consumer testimony does not automatically create a failure of
evidence on secondary meaning. See Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc., 870 F.2d 512, 517 (9th Cir.

25  1989) (evidence of use and advertising of trade dress but lack of evidence of views of actual purchasers still
sufficient to establish secondary meaning).

26       [4]Although purchaser Suzanne Beltran testified that she repeatedly bought shirts with the images on
them for her daughters, she did not testify as to any association she had formed between a recognition of the

27  images and the company. (4/24/07 Beltran Test. 84:20 - 93:23.)

28                            8                    04cv1035

1    The circumstances here thus mirror that of Japan Telecom, Inc. v. Japan Telecom

2 America Inc., 287 F.3d 866, 874 (9th Cir. 2002), where sparse evidence of purchaser

3 recognition came from longtime customers and associates.  As the Court noted in  Japan

4 Telecom, "every small business with a descriptive name can point to at least a few former

5 customers who remember its name . . . . None of that means that the relevant buying public

6 makes the same associations."  Id.  For such evidence to be persuasive there must be a

7 showing that the mental image formed by such witnesses was not just due to personal

8 relationships with the business owner but "because of some stimulus that was just as likely

9 to affect members of the buying public as it was likely to affect them."  See id.  While Art

10 Attacks argues that its witnesses testified to the distinctive look of the spoiled brats images,

11 it offered no evidence why the public would have associated the images to Art Attacks (or

12 at least identified the images as originating from a single source, even if the identity of the

13 source was unknown).

14    With regard to advertisement, whether it is enough to create secondary meaning

15 depends on its "amount, nature and geographic scope."  Japan Telecomm, 287 F.3d at 875.

16 The evidence indicated that Art Attacks spent only approximately $2000 a year for

17 business cards and order forms primarily given to purchasers of its T-shirts.  Art Attacks'

18 primary source of publicity came from its display at its fair booths of the T-shirt images

19 that it airbrushed, as well as on the purchased T-shirts that were either worn by the

20 purchasers or exhibited through the clear plastic bag in which they were purchased.  The

21 fairs at which Art Attacks exhibited attracted millions of people over the years involved but

22 how many people even saw the booth of the cartoon images is total speculation.

23 Additionally, Art Attacks advertised its images on its website but the site did not feature the

24 images; they could only be found by "scrolling down" through an eclectic collection of

25 information.  The evidence does not support a focused program of advertising the spoiled

26 brat business, but only a diffuse, local listing of the company which included some images

27 along with a non-specific inventory of other artistic offerings.

28

9                                    04cv1035

1    Advertising, even it were substantial, which it is not, is not enough.  "The

2 advertising and promotional activities must involve 'image advertising,' that is, the ads

3 must feature in some way the trade dress itself" such that potential customers associate the

4 trade dress with its source.  First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383

5 (9th Cir. 1987).  Here, there is only de minimus evidence of image advertising:  the images

6 were present at Art Attacks' booth and some of the spoiled brat images were displayed on

7 Art Attacks' website.  However, neither of these displays were focused on the spoiled brat

8 images.  Both the booths at the fair and the website displayed many images, most of which

9 were unrelated to the spoiled brats images. (Trial Tr. April 24, 2007, Test. S. Stone 21:3-

10 17, 31:7-12; Ex. 374 (website); Ex. 5012, 5014. 5060 (fair booth photos); Trial Tr. April

11 30, 2007, Test. J. Mauck 240:15 - 248:5.)  See e.g., First Brands Corp. v. Fred Meyer, Inc.,

12 809 F.2d 1378, 1383 (9th Cir. 1987) (plaintiff's advertising did not focus on the claimed

13 trade dress, the color and shape of product, and thus did not encourage consumers to

14 associate the trade dress with their source in a manner sufficient to establish secondary

15 meaning); Walker & Zanger, Inc. v. Paragon Industries, Inc.,  - - F. Supp 2d - - , 2007 WL

16 1302980, *10 (N.D. Cal. May 3, 2007) (noting that "the advertising must direct the

17 consumer to those features claimed as trade dress; merely 'featuring' the relevant aspect of

18 the product does not suffice").  As for the business cards and brochures containing one or

19 more of the spoiled brat images and the company name that were distributed to purchasers

20 and/or available at the fair booths, the numbers distributed were either unestablished or

21 minimal.[5]  See e.g., Continental Laboratory Products, Inc. v. Medax Intern., Inc., 114 F.

22 Supp. 2d 992, 1001 (S.D. Cal. 2000) (distribution of flyers and booklets to a minimal

23 and/or unidentified number of recipients insufficient to establish secondary meaning).

24

25        [5] Ms. Mauck testified that business cards and order forms were distributed with purchases and that
26 brochures were available at the fair booths. (Trial Tr. Apr. 30, 2007, Test. J. Mauck 28:12-30:7, Apr. 26, 2007,
31:1-32:1.) However, only approximately 2,000 T-shirts painted with spoiled brats were sold per year starting
27 from 1993 (Trial Tr. Apr. 26, 2007, Test. J. Mauck 64:3-9) and no estimate of the number of brochures
distributed was presented.

28                                             10                                    04cv1035

1  There also was little or no evidence that any of Art Attacks' advertising was effective.

2  Many of the witnesses MGA presented and even some of those for Art Attacks were

3  unaware of the spoiled brat images and had never heard of Art Attacks.  In total, there was

4  insufficient evidence of "image advertising" presented at trial to establish secondary

5  meaning.

6         Therefore, lacking sufficient evidence of purchaser perception or advertising to

7  substantiate secondary meaning, no reasonable jury could find that this element was

8  satisfied on the trade dress infringement claim; the Court therefore **GRANTS** MGA's

9  motion on this ground.

10                **2.        Likelihood of Confusion**

11         A multi-factor test is applied to assess likelihood of confusion: 1) strength of the

12  mark; 2) proximity of the goods; 3) similarity of the marks; 4) evidence of actual

13  confusion; 5) marketing channels used; 6) type of goods and the degree of care likely to be

14  exercised by the purchaser; 7) defendant's intent in selecting the mark; and 8) likelihood of

15  expansion of the product lines.  First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378,

16  1384 (9th Cir. 1987); AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 349-50 (9th Cir. 1979).

17  These factors were given to the jury in the Court's Jury Instruction No. 54; only three of the

18  factors figured at all in the evidence, and these only minimally.

19         On the issue of marketing channels, there was minimal overlap.  The evidence

20  showed that Art Attacks' primary market is county fairs, whereas BRATZ products are sold

21  at retail stores.  The only possible overlap was the appearance of an Art Attacks booth

22  inside Wal-Mart where customers could bring T-shirts to be painted by Art Attacks.

23  However, Art Attacks had stopped selling at Wal-Mart after 2000, before the BRATZ

24  products became available in 2001.[6]

25         As to type of goods and degree of care, some differences were apparent.  Art

26  _____

27  [6] Joann Mauck testified that Art Attacks was a traveling vendor for Wal-Mart starting in 1997 and continuing through 2000. (Trial Tr. Apr. 26, 2007, Test. J Mauck 10:23-17-1.)

28                                  11                          04cv1035

1  Attacks' products are T-shirts and other clothing individually air-brushed for the customer,

2  often based on customer requests as to the details of the images painted.  Art Attacks does

3  not sell dolls.  BRATZ products include T-shirts as well as dolls; these products are

4  purchased "as is" off the shelf.  Regarding degree of care, MGA argues that Art Attacks'

5  customers took care in planning their visits to the Art Attacks' booth and in selecting their

6  images for T-shirts indicating a higher degree of care.  However, as to the purchasing

7  generally of T-shirts and dolls, there was little evidence.  On this factor, a reasonable juror

8  using common sense might conclude that these products which are relatively inexpensive

9  non-luxury items might be purchased with a lesser degree of care than other items (such as

10  a high priced car or computer).

11      On actual confusion, MGA contends that simply the absence of any survey evidence

12  to show actual consumer confusion is definitive. While absence of survey evidence can

13  indicate that a likelihood of confusion is not present, see Essence Communications, Inc. v.

14  Singh Industries, Inc., 703 F. Supp. 261, 269 (S.D.N.Y. 1988), other evidence of actual

15  confusion may be persuasive, see e.g., Mattel, Inc. v. Azrak-Hamway Intern., Inc., 724

16  F.2d 357, 361 (2nd Cir.  1983) (noting that "direct evidence of actual confusion by

17  customers, retailers, salesmen, or the like" and/or survey evidence are usual ways of

18  demonstrating a likelihood of confusion); see also Dr. Seuss Enterprises, L.P. v. Penguin

19  Books USA, Inc., 109 F.3d 1394, 1404 n.14 (9th Cir. 1997) (noting at least three types of

20  proof for a likelihood of confusion: survey evidence; evidence of actual confusion; and

21  similarities of the marks and their use in the marketplace).  Here, three witnesses (in

22  addition to JoAnn Mauck)[7]  testified to actual confusion as to the source of the products.

23  MGA argues that these witnesses all had biases; one witness was a friend of Ms. Mauck

24  and the other two were long-time customers.  While such connections may impact the

25

26      [7] Ms. Mauck's testimony as to what customers said to her about confusion was admitted not for the
truth of the matter but as to effect on Ms. Mauck, that she was accused of copying. (Trial Tr. Apr. 26, 2007,
27  Test. J. Mauck 72:11-19.)

28                                                    12                                          04cv1035

1    credibility of such witnesses, credibility is not for the Court to judge, that was left to the

2    jury.[8]

3           MGA also argues that this evidence was de minimus.  The amount of actual

4    confusion that need be shown may be influenced by the similarity between the products.

5    Where such similarity is strikingly absent or where it is clear consumers would have been

6    skeptical that the products came from the same source, de minimus evidence of confusion

7    may fail to support a likelihood of confusion.  See King of the Mountain Sports, Inc. v.

8    Chrysler Corp., 185 F.3d 1084, 1093 (10th Cir. 1999) ("The de minimis evidence of actual

9    confusion is especially undermined in this case by the sheer lack of similarity between the

10   marks."); Int'l Ass'n of Machinists and Aerospace Workers, v. Winship Green Nursing

11   Center, 103 F.3d 196, 205 (1st Cir. 1996) (noting that "no person of ordinary prudence and

12   normal intelligence . . . would have been confused as to the source" and thus, the evidence

13   was not representative of actual confusion).  Here however, the jury made no finding on the

14   actual similarity of the products.  The issue of similarity was hotly disputed by the parties'

15   experts. While MGA argues that its expert SB Masters should be given more weight

16   because her testimony went more to the overall impression of the products in the

17   marketplace, again that is for a jury to decide, not the Court.

18          In sum, although the evidence was very slim, the Court cannot say that a reasonable

19   jury could have only found there to be no likelihood of confusion.  However, since as

20   explained above, sufficient evidence of secondary meaning was lacking, MGA's motion for

21   judgement as a matter of law on the trade dress claim is **GRANTED**.

22   **IV.    CONCLUSION**

23          For the reasons herein, the Court **GRANTS** MGA's motion for judgment as a matter

24

25          [8] MGA's reliance on Continental Laboratory Products, Inc. v. Medax Intern., Inc., 114 F. Supp.2d
26   992,1006 (S.D. Cal 2000) is unhelpful here.  That case primarily deals with testimony of employees' confusion
     as failing to be persuasive evidence of a consumer's confusion.  Here, the testimony was from at least three
27   consumers (not employees).

28                                              13                                    04cv1035

1  of law on the claim of copyright infringement.   The Court also **GRANTS** MGA's motion

2  for judgment as a matter of law on contributory copyright infringement as to Larian and on

3  trade dress infringement.

4

5  **IT IS SO ORDERED.**

6

7  DATED:  July 2, 2007

8

9                                            Hon. Rudi M. Brewster
                                             United States Senior District Court Judge

10

11

12  cc:  Hon. Barbara L. Major
           United States Magistrate Judge

13
           All Counsel of Record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    14                              04cv1035